IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>JEFFREY MCWHORTER | Criminal No: 2:24-cr-00871-DCN<br><br>**SENTENCING MEMORANDUM** |

On December 11, 2024, Defendant Jeffrey McWhorter ("Defendant" and/or "McWhorter") pled guilty to a one-count Information charging him with conspiracy to commit honest services fraud in violation of 18 U.S.C. § 371. The United States Probation Office ("USPO"), in its Presentence Report ("PSR"), determined that the total offense level for McWhorter is an 11, which results in a guideline range of 8 to 14 months. As will be discussed in more detail below, the Government believes the advisory guidelines were properly calculated by the USPO.[1] Further, the Government believes that an evaluation of the 18 U.S.C. § 3553(a) factors support a sentence within the advisory guideline range of 8 to 14 months.

I.   BACKGROUND.

In December 2024, McWhorter pled guilty to a one-count Information for his role in a conspiracy to defraud a Texas Company out of its employee's honest services. *See* ECF No. 1. At the time McWhorter was involved in the conspiracy, he was the President of Palmetto Railways, which is a quasi-state entity that falls under the South Carolina Department of Commerce.

---

[1] McWhorter has raised two objections to the PSR, which, if sustained, would substantively affect his total offense level. The first objection is to the loss amount and the second is to the enhancement for abuse of trust. The Government will be prepared to address these objections at sentencing, should it be necessary.

The Texas Company is a logistics company that primarily is involved in the movement of plastic pellets and nearly all of the Texas Company's business is affiliated with railways. In 2010, the Texas Company began to explore a new business location in Charleston, South Carolina, and between 2014 and 2015 North Charleston, South Carolina had been identified as a potential location for a new warehouse for the Texas Company.[2] *See* PSR ¶ 22. In 2017 the Texas Company went to McWhorter and asked for recommendations for a contractor to build its new warehouse. *See* PSR ¶ 22.

One of the companies that McWhorter introduced the Texas Company to was a local Charleston, South Carolina company owned by an individual with the initials T.B. *See* PSR ¶ 21. In fact, T.B. asked McWhorter to facilitate an introduction between him and the Texas Company. *See* PSR ¶ 23. Through this process, the Texas Company's Vice President of Sales and Marketing, Kevin Newkirk[3] (hereinafter referred to as "Newkirk" and referred to in the Information as "Employee 1") was also in Charleston, South Carolina often as he assisted the Texas Company in identifying the new location. *See* PSR ¶ 22.

The Texas Company solicited bids for the construction of its North Charleston warehouse and T.B.'s company is one of the company's that submitted a bid. During the bidding process, McWhorter, T.B., and Newkirk discussed that T.B. would pay McWhorter and Newkirk a kickback if T.B.'s company was awarded the bid by the Texas Company.[4] *See* PSR ¶ 23. At one

---

[2] At the time the location had been identified, Palmetto Railways owned the property. Ultimately, the Texas Company purchased the land from Palmetto Railways.
[3] Newkirk was charged and has been sentenced by this Court in Case No. 2:24-cr-00685.
[4] McWhorter and Newkirk have different recollections on whose "idea" it was to receive a kickback from T.B. This fact has no bearing on the guidelines and, further, McWhorter agrees he did, in fact, receive a kickback. Regardless of whose idea it was to receive the kickback, the Government does not believe it mitigates the offense conduct in any way.

point during the bidding process, it was determined that McWhorter was in possession of a competitor bid from Newkirk and shared this with T.B. There was no reason for McWhorter to have the competitor bid. *See* PSR ¶¶ 28, 31, 46. Moreover, when Newkirk sent the bid to McWhorter, he knew that he and McWhorter stood to gain financially should T.B. be awarded the contract. *See* PSR ¶ 38.

T.B.'s company was awarded the contract and in September 2019, and he sent the first payment to an account in the name of a company associated with Newkirk's wife. *See* PSR ¶ 24. From September 2019 to July 2020 a total of $420,000 was wired by T.B to Newkirk's wife's account. *See* PSR ¶ 24. The original agreement between the conspirators was that T.B. would pay $1 million; however, T.B. ceased payments after $420,000 because he had exhausted all contingency funds for the project.[5] *See* PSR ¶ 27. T.B. was willing to pay McWhorter and Newkirk because McWhorter facilitated T.B. being awarded the contract and T.B. hoped to get future work from the Texas Company.

The investigation revealed that McWhorter agreed with Newkirk that he would be paid his portion of the kickback payment in cash by Newkirk. *See* PSR ¶¶ 23, 38. Newkirk informed federal agents during the investigation that McWhorter had concerns over losing his federal pension and cash transactions would raise less suspicion. *See* PSR ¶ 39.

As for how the payments were split, Newkirk and McWhorter agreed to spilt it 50/50. This would have resulted in McWhorter receiving $210,000; however, Newkirk informed federal agents he held back $73,500 for taxes, which resulted in McWhorter receiving $136,500. *See* PSR ¶ 41.[6]

---

[5] The PSR does an excellent job of setting forth the timeline of events pertaining to the conspiracy in paragraph 25.
[6] McWhorter disputes that he received the full $136,500 and believes he received closer to $90,000. The Government would set forth that it can prove by a preponderance of the evidence that McWhorter received the $136,500. It is also worth noting that McWhorter was truthful with the

3

McWhorter, per his agreement with Newkirk, received his portion of the kickback payments in small chunks of cash throughout the course of the conspiracy. Sometimes the cash was mailed and at other times it was delivered in person. ¶¶ 41-45.

**II.     THE GOVERNMENT BELIEVES THAT AN EVALUATION OF THE STANDARDS SET FORTH IN 18 U.S.C. § 3553(a) WARRANTS A SENTENCE IN THE ADVISTORY GUIDELINE RANGE.**

The sentencing statute, 18 U.S.C. § 3553(a), requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[7] In order to determine the "particular" sentence to impose, the Court must consider the familiar statutory factors listed in §3553(a)(1)-(7). Two of the statutory factors that the Court must consider are (1) the advisory guidelines range set by the Sentencing Commission and (2) the Commission's policy statements are factors to be considered. *See* §3553(a)(4) and (a)(5). Further, the Advisory sentencing guidelines "should be the starting point and the initial benchmark" in determining the appropriate sentence. *See Gall v. United States*, 522 U.S. 38 (2007). Here, as explained below, an examination of the § 3553(a) factors support a sentence that involves incarceration for McWhorter.

**A.     Nature of Offense and History and Characteristics of Defendant – §3553(a)(1).**

*Nature of the Offense*

The offense that McWhorter has pled guilty to is a serious offense and it was committed while McWhorter was the President of Palmetto Railways. Put another way, McWhorter was paid a kickback while employed by Palmetto Railways. While the contract at issue was a private

---

Government when he was debriefed and conceded that it was possible he received more than he recalled.

[7] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(A)-(D).

4

contract, McWhorter's position with Palmetto Railway was important to the Texas Company and T.B. McWhorter played a role in identifying the land where the Texas Company built its warehouse and, ultimately, introduced T.B. to the Texas Company. T.B. also acknowledged that McWhorter facilitated his introduction to the Texas Company, which is why he was willing to pay him.

The evidence revealed through the investigation established that McWhorter did not just passively receive the kickback payment. McWhorter was involved in at least one meeting with T.B. and Newkirk where the payment was discussed, and he also shared a competitor bid with T.B. knowing he stood to benefit if T.B. was awarded the contract. *See* PSR ¶¶ 37-38. Further, McWhorter and Newkirk discussed how the kickback would be split, and McWhorter wanted his portion in cash. McWhorter abused his position of trust both with the Texas Company and, ultimately Palmetto Railways, by agreeing to accept the kickback payment. His conduct was serious, the fraud offense is a serious offense, and a period of incarceration is appropriate.

### *History and Characteristics of the Defendant*

As the PSR appropriately sets forth, McWhorter has no criminal history, and he has been awarded the zero-point offender reduction because of his lack of criminal history. *See* PSR ¶ 71. The Government is also aware that the Guidelines Manual application notes set forth that probation is *generally* appropriate for individuals who are awarded the zero-point reduction and are in Zone A or B. *See* U.S.S.G. § 5C1.1, n. 10(A) (emphasis added). The offense McWhorter has pled guilty to, coupled with his position at Palmetto Railways at the time of the offense, is not an offense where probation is appropriate.

> **B.     Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, Afford Adequate Deterrence to Criminal Conduct, and Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant – §3553(a)(2)(A)-(C).**

Economic crimes and white-collar offenses must be met with sentences commensurate with the seriousness of the crimes themselves. Concern that "white-collar offenders … frequently do not receive sentences that reflect the seriousness of their offenses" was among the motivations for the Sentencing Reform Act that gave rise to the United States Sentencing Guidelines. S. Rep. No. 98-225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3260. Among the principal architects of the guidelines was Justice Stephen Breyer, an original member of the Sentencing Commission. He explained that the Guidelines required a "short but definite period of confinement" for all but "the least serious cases of these white-collar offenses (level '6' or less)[.]" Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 22 (1988).

Further, fraud is "'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.Rev. 721, 724 (2005)). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *Id*.

McWhorter's case is not in the arena of the least serious cases and a period of incarceration would not be greater than necessary and would serve the sentencing goal of providing just punishment for the offense and respect for the law. Further, a period of incarceration would address the deterrence factor of § 3553(a), which is so critical in corruption and fraud cases.

### C. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct – §3553(a)(6).

Congress has directed sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ." 18 U.S.C. § 3553(a)(6). "[T]he kind of disparity with which § 3553(a)(6) is concerned is an unjustified difference across judges (or districts) rather than among defendants to a single case." *United States v. Pyles*, 482 F.3d 282, 290 (4th Cir. 2007), *vacated on other grounds* by 552 U.S. 1089 (2008) (internal quotation marks omitted). Thus, the Court is tasked with evaluating sentencing disparities nationwide, rather than between co-defendants. *See id*. "The Guidelines' goal of national sentencing uniformity is not aimed only at the particular criminal conduct that co-conspirators may share, but also addresses other factors that often vary between co-conspirators like acceptance of responsibility and assistance to the government." *United States v. Withers*, 100 F.3d 1142, 1149 (4th Cir. 1996).

Notwithstanding the Fourth Circuit's noted goal of avoiding unwarranted nationwide disparities, the court has numerous times considered disparities among similarly situated co-defendants to be valid challenges to procedural reasonableness of a sentence. *See, e.g.*, *United States v. Webb*, 965 F.3d 262, 271 (4th Cir. 2020) (considering defendant's "arguments regarding sentencing disparities with his co-conspirators – an argument drawn directly from the 3553(a) factors" to be a non-frivolous argument district court needed to address); *United States v. Vinson*, 852 F.3d 333, 358 (4th Cir. 2017) (rejecting argument that defendant's sentence resulted in unfair disparity between co-defendants under 3553(a)(6) because co-defendants pleaded, but defendant went to trial); *United States v. Allmendinger*, 706 F.3d 330, 343 (4th Cir. 2013) ("Indeed, the district court specifically noted that it was considering unwarranted disparities both among defendants in

7

general and among co-defendants within the case. We therefore conclude that the district court's explanation satisfied the requisite standard.").

Here, although McWhorter was the sole Defendant in the Information that he pled guilty to, his coconspirator was charged in a separate Information and has been sentenced by this Court. While McWhorter's coconspirator did not receive a period of incarceration, he pled guilty to a different offense. A review of the PSR, and the facts as set forth in this sentencing memorandum, establish that period of incarceration for McWhorter would not create an unwarranted disparity between him and Newkirk. Newkirk was not a public official at the time he received the kickback payment. Section 3553(a)(6) does not require that all co-defendants and coconspirators be treated identically, what it requires is a sentence be fashioned to avoid any *unwarranted* disparity.

### III. CONCLUSION.

For the reasons stated in this memorandum, the Government believes the probation officer has correctly calculated the guidelines and believes that after § 3553(a) are examined, a sentence within the advisory guideline range is sufficient but not greater than necessary to comply with the relevant sentencing factors.

    RESPECTFULLY SUBMITTED,

    BRYAN P. STIRLING
    UNITED STATES ATTORNEY

    BY: /s/ *Amy Bower*
        Amy F. Bower (Fed. Id. 11784)
        Assistant U.S. Attorney
        151 Meeting Street, Suite 200
        Charleston, South Carolina 29401
        Tel.: (843) 727-4381
        Email: Amy.Bower@usdoj.gov

Charleston, South Carolina
May 16, 2025